ANDREW WOODS and WIFE *v.* BENJAMIN W. STURDEVANT et al.

1. GIFT: PRESUMPTION FROM DELIVERY OF PROPERTY BY PARENT TO CHILD.— If a parent deliver a slave into the possession of a child soon after marriage, it is presumed in law, in the absence of other evidence, to have been a gift and not a loan.

2. EVIDENCE: WEIGHT OF: CASE IN JUDGMENT.—In this case the complainant, who was a married woman, claimed title to a slave under a deed alleged to have been executed in 1818; and in support of her case, read in evidence the deposition of a witness which stated clearly and positively the execution of the

deed, and the delivery of the slave under it. The defendants denied the execution of the deed, and asserted that before its date, the title to the property had been given by the grantor to the husband, under whom they claimed title, and had held possession for many years. The court reviewed the evidence offered in support of the answer, and in opposition to complainants' alleged title, and which consisted of a great number of circumstances tending to support the answer, and reach the conclusion, that it is sufficient to overturn the positive statements of the complainants' witness.

ERROR to the Chancery Court of Carroll county. Hon. William Cothran, chancellor.

A very full and detailed statement of the pleadings and evidence, will be found in the opinion of the court, and in the brief of counsel for defendants in error.

*Yerger & Rucks,* for plaintiffs in error.

The Statute of Limitations is no bar to the complainants' right to relief.

Where personal property is illegally disposed of, or permitted to pass into the hands of a third person not entitled thereto, the Statute of Limitations will not run against a *cestui que trust* under disability, till the disability is removed; and a *cestui que trust* may sue and recover where the trustee could not. *Bacon* v. *Gray,* 1 Cushm. 140.

The defendants cannot claim as *bona fide* purchasers without notice, because they are not purchasers of the legal title.

The legal title was in the trustee; the equitable is in the wife. The husband had no title, and a purchaser from him acquired neither legal or equitable title.

The fact that the deed of trust was not recorded, is not material, because trust deeds are only to be recorded as between the grantor and his creditors and purchasers; and 2dly, because, in this State, there is no statute requiring deeds of trust executed in other States to be recorded.

I refer the court to *Wyse* v. *Dandridge,* Opinion Book H., page 367, 368, and also Story's Equity, to show that a party claiming to be a purchaser for valuable consideration without notice, must be a purchaser acquiring the legal estate. But that where it

is a contest between equities, that which is in point of time is first in right.

But these defendants cannot invoke this rule of being *bona fide* purchasers, for they are neither purchasers of the legal or equitable title. They claim by purchase under Andrew Woods, who never had any title; and Chancellor Kent says: "The general principle applicable to the law of personal property throughout civilized Europe, is, that no one can transfer to another a greater right than he has himself;" and "A sale, *ex vi termini,* imports nothing more than that the *bona fide* purchaser succeeds to the rights of the vendor." 2 Kent's Comm. 8th edit. 380, 381.

As Andrew Woods had no title, he could transfer none; and these defendants, claiming under him, have acquired nothing. This rule is universal. The case of *Wyse* v. *Dandridge,* was upon the ground that the purchaser obtained the legal title from the trustee, without notice of the equity outstanding; and having thus acquired the legal title without notice, and having an equal equity, the legal title prevailed.

To entitle a party to claim as a *bona fide* purchaser, he must be a purchaser without notice, and for a valuable consideration, and must have paid the purchase-money. So he must have purchased the legal title, and not be a mere purchaser without a semblance of, title, for even the purchaser of an equity, is bound to take notice of and is bound by, a prior equity; and between equities, the established rule is, that he who has the prior equity, in point of time, is entitled to like priority in point of right. See Story's Equity, § 1502; 7 Cranch, 2; 10 Peters R. 177; 1 Story's Eq. 76, § 58; 2 Cushman's R. 229 *et seq. ;* 24 Miss. R.

In the present case, however, the defendant is, in no sense, a *bona fide* purchaser, because he purchases from or through Andrew Woods, who had no semblance of right; who did not have either legal or equitable title, or any title at all; and therefore could not sell any. See particularly *Gully* v. *Hull,* 2 George R. 20.

*J. Z. George,* for defendants in error.

The complainants claim an equitable title in Mrs. Woods to slave Jacko in possession of Pitman and Nancy, in possession of Dismukes and wife, as the children of Máry, who was the child of

Hicksey, and to Amanda (and her offspring), alleging that Amanda is also the child of Hicksey.

They allege that Mary was born after the accrual of their title to Hicksey, but in reference to Amanda, they make no such allegation.

The statement of the bill on this subject is as follows:

" That in 18—, Amanda, a child of Hicksey, came into the possession of Wallace Wilson, under a pretended contract of purchase from complainant, A. Woods, and that Wilson then knew she belonged to complainant Huldah, as her separate estate.

" That said slave Amanda, who is a black-complexioned slave, over the age of thirty years, with some four or five children," &c.

These are the only statements in the bill which have reference to the complainant Huldah's title to Amanda. She claims her as the issue of Hicksey: to render her title valid, the slave must have been married whilst Hicksey was owned by them, and hence the importance of their alleging that Amanda was born after the 6th of April, 1818, the date of their alleged title to her master. Failing to do this, they show no title to Amanda and her children, and the defendant's, Sturdevant's, demurrer should be sustained, and the bill dismissed.

They claim title to Hicksey under a deed in trust, alleged to have been executed in 1818 (on the 6th April), by William Caperton to Thomas S. Caperton, as trustee, to secure Hicksey and other property to the separate use of Mrs. Woods; and they allege that on that day the said W. Caperton was the owner of Hicksey, and executed and delivered the deed, and also the possession of the slave.

Three things are essential to the validity of Mrs. Wood's title, any one of which not being established, her title is invalid.

1. The ownership by W. Caperton, the grantor of Hicksey, and his right to convey.

2. The due execution and delivery of the deed, and its registration.

3. An acceptance of the deed and of the property under it by. Mrs. Woods, or her husband for her.

I shall notice them in the order above set out.

1. The defendants claim under A. Woods, and may therefore

deny the title of W. Caperton and set up the title in Woods.   The complainants allege the ownership in the father of Mrs. Woods, and the defendants positively and unequivocally deny it, and assert in opposition thereto, an existing right in Andrew Woods.

It was incumbent on them to show affirmatively the title of the donor in the deed in trust.

It appears that Woods and wife married early in 1817, and that they resided with W. Caperton, the father of Mrs. Woods, until the fall of that year, when they went to housekeeping at a place not over one-quarter of a mile from the residence of the said William; that when they went home they carried the slave, Hicksey, and another, with them; and all the evidence (except that of T. S. Caperton), further shows, that Woods and wife remained in the possession of said slave, from the time they first acquired it, until she was sold, about the year 1830.

By the law of Tennessee, at that time, a parol gift of slaves was valid (the statute changing this rule was not passed until 1831); and it is now too well settled to admit of controversy, that where such parol gifts are valid, if the parent upon the marriage of a child, or soon afterwards, deliver into the possession of the child a slave or other chattel, it is in law a gift, and not a loan, unless it be shown that an intention to loan merely was expressed at the time.   This presumption is favored by the courts, and will not be held to be rebutted by slight circumstances, but only by clear and positive proof, because the gift is but the performance by the parent of a natural duty to the child, and because it unites the possession and the title.   See *Johnson et al.* v. *Dilliard,* 1 Bay's R. 232; *Moore* v. *Davoney,* 3 Hen. & Munf. 127; *Torrence* v. *Graham,* 1 Dev. & Batt. 284; *Falconer* v. *Holland,* 3 S. & M. 698; *Adams* v. *Hayes,* 2 Iredell, 361; *Green* v. *Harris,* 3 Ib. 210.   And this was the rule in Tennessee at the time this transaction took place.   See *Stewart* v. *Cheatham,* 3 Yerg. 60.

But complainants rely upon the evidence of T. S. Caperton to rebut this presumption and to establish a loan.

This witness swears that the possession of A. Woods prior to the 6th April, 1818, was under a loan, and that Woods never owned her before that time.   That on the 6th April, 1818, Hicksey was in possession of William Caperton, who exercised ownership and

control over her. But how long before that day he had possession, witness cannot state; all he knows is that on that day she was present, and delivered under the deed.

This witness did not reside with his father, W. Caperton, in 1817 and 1818, but in the town of Winchester. He does not state the facts upon which he bases his conclusion, that the possession of A. Woods was under a loan. He does not pretend that he was present when the possession was delivered, or that he ever heard Woods acknowledge that the possession he held was under a loan. He gives us nothing but his judgment that it was a loan: as to how he derived his impression or came to his conclusions, we are left entirely in the dark.

But it is most probable that he was not present, and had no personal knowledge on the subject; he did not live with his father, but in Winchester; he does not know, though remarkably accurate as to dates, and other *minutiæ* on other points, when the slaves went into possession of Woods, nor how long they had possession before the date of the deed, nor how long after the marriage of Woods and wife it was when their possession commenced. Moreover, he is shown to be very wide of the mark, on the material point of the date of the marriage of Woods and wife, and intimately connected with the matter about which he testifies. He states that the marriage took place in 1818, just before the deed was executed, and it is clearly shown that it took place in the fore part of 1817, more than a year before.

His ignorance on these points, and his remarkable particularity as to others, and his failure to state the grounds of his conclusion as to the loan, and his uniform course in mentioning his presence, and the grounds of his information on others, make it manifest that he had no personal knowledge of the matter about which he testified. It will be observed that he states that he was present when the deed was executed, was present when it was acknowledged, was present and delivered it to Hayter for registration, and he also details, unasked, the conversations between him and W. Caperton which led to the execution of the deed.

Again: his statement "that the possession was under a loan," is necessarily a conclusion compounded of law and fact. And if he is mistaken in the law (as he was in relation to the loss of the deed

Woods and wife *v.* Sturdevant et al.

destroying Mrs. Woods's title), his testimony is worthless. Although the evidence is not strictly incompetent, yet it is intrinsically weak, coming, as it necessarily does, in the absence of the facts inseparably connected with the witness's private notions of law.

But in opposition to this witness, and in aid of the legal presumption in our favor, there is much proof of a very convincing character.

1st. John Caperton, Mrs. Woods's brother, and a witness for complainants, was eighteen or nineteen years old in 1817. He resided with his father, at the time of the marriage in 1817, and up to 1821. He regarded the first possession as a gift. Woods claimed the negroes from the first possession, and witness's father never afterwards set up any claim to them, and that the slaves were never, after the first delivery to Woods and wife, out of their possession, and in the possession of the said William Caperton. This witness, let it be remembered, resided all the time with his father, and within one-quarter of a mile of Woods and wife. It is incredible, that the slaves should have been out of the possession of Woods and wife, and in that of his father, and that his father should have claimed them, without his knowing or having heard of it.

2d. Mrs. Elizabeth Woods resided within two miles of W. Caperton, and one and a half miles of Woods and wife, in 1817 and 1818. She proves that A. Woods and wife had possession of the slaves, from the time they went to housekeeping, in 1817, till the slaves were sold. This possession was continued and uninterrupted; and Woods claimed them, and exercised ownership and control over them all the time, including the time of his possession previous to 6th April, 1818; and this was notorious in the neighborhood. She never heard of this pretended loan, nor the surrender of the slaves to W. Caperton.

3d. To the same effect is the testimony of Mrs. Patrick, who resided within two miles of W. Caperton. She also states that A. Woods sold one of Hicksey's children to her husband, in 1827.

4th. Calloway Garner was intimate with complainants and W. Caperton in 1817 and 1818, and resided in the same neighborhood, about two miles from the latter. It was understood in the neighborhood, that the possession of Woods and wife, before 6th April, 1818, was under a gift. Woods claimed the negroes, and exercised ownership and control over them, and had possession of them from

soon after his marriage, previous to 6th April, 1818, and after-wards, continuously up to the time they were sold.

These witnesses all state positively, that the possession before 1818, was under a gift; but upon examining the grounds upon which the statement is made, it appears that they had no personal knowledge on that subject. But whilst they are not, therefore, direct witnesses of the gift, yet the three last, in connection with John Caperton, establish very clearly and circumstantially, there was a gift to Woods and wife previous to 6th April, 1818. They prove the continued and uninterrupted possession of Woods, from a period shortly after his marriage, when he went to housekeeping, till the slaves were sold, long after 1818; that he claimed title and exercised ownership and control over them, prior to the date of the deed, and afterwards; and that his claim and acts in that behalf were notorious in the neighborhood. That all this was done by Woods, in sight of the residence of the grantor, who must, there-fore, have been cognizant of them, and yet he never once asserts a contrary claim, or disputes the title of Woods, but acquiesces in the same. This is a very strong admission, on his part, that the claim of Woods was just.

5th. The deed, on its face, furnishes very strong circumstantial evidence, that the donor had no title, and that, therefore, a gift had been made. The language of the grant is, that he conveys " all his right, title, and interest, which he has at this time." He con-veys by quitclaim. This is an acknowledgment that he had done something before that time to defeat or impair his title; that thing was the prior gift to Woods. A quitclaim deed is notice to the grantee, that the grantor's title is defective; it operates merely as an acquittance of any right or title that the grantor may have. *Smith* v. *Winston's Ex'ors*, 2 How. Miss. 601. It is incapable of conveying anything but a doubtful title, and cannot be made the foundation of a bill in equity to remove clouds. *Kerr* v. *Freeman*, decided last April.

6th. There was no change created by the deed, in the conduct of the parties and the family, in relation to the slaves. Woods claimed them before; he claimed them afterwards, and sold some of them in Tennessee and in this State, with the knowledge and acquiescence of the grantor, and of Mrs. Woods. A lawsuit is prosecuted to

subject Amanda to Woods's debts.   An attempt is made to defeat it, and to secure the property in the family, to Wallace Wilson, a brother-in-law.   William Caperton has direct knowledge of this suit, by becoming a party to Wilson's bond, obligating him to have the slave Amanda forthcoming.   But although their efforts are unavailing, yet they failed to suggest what, if true, would have been a complete defence,—the title of Mrs. Woods.   I suppose they hardly found other lawyers so ignorant as to believe that her title was lost with the deed.

This uniform course in the conduct of the parties is perfectly consistent with the hypothesis, that there was a gift prior to 1818, and utterly at war with the pretence of a loan.   And it is no answer to this to say, that the deed was lost (in the possession of the grantor) ; for whilst that may probably be regarded as a flimsy excuse for not setting up a claim under it, against Woods's creditors, it certainly is no reason why Woods and the other members of the family, should always treat the slaves as the property of the husband, when the rights of creditors were not involved.

7th. That the deed was not acknowledged for two years after its date, being unexplained and without any attempt at explanation ; that it was never recorded, and was, after the lapse of forty years, found amongst the worthless papers of the grantor, all go to show, that the parties to it had no confidence in it, and that the design, once formed, to attempt to secure the property from Woods, was afterwards abandoned for some cause ; and the concession on its face, that the grantor's title was defective, shows that the true reason was, that the title to the property was not in a situation to be thus secured.   But these points will be noticed more fully in the question of delivery of the deed.

8th. The complainants, in their bill, do not allude to the fact, that there had been a delivery of possession to them soon after their marriage, and before the 6th of April, 1818.   The bill distinctly conveys the idea, that the possession had never been in them previous to the 6th April, 1818, and that up to that time, it had always remained in the grantor.   Considering the importance of this fact upon their right to recover, the omission of any allusion to it in the bill, is a fraudulent attempt to foist upon the court a state of facts which is untrue, and to gain a decree by trickery and chicane.

Woods and wife *v.* Sturdevant et al.

It is also evidence, that such possession was by virtue of a gift, and that the loan attempted to be proven by their witness was a mere after-thought, to repel the presumption which had arisen from the discovery of the fact which they had attempted to conceal. The delivery had taken place forty years ago, in a State distant from the place of the trial, in which the defendants, some of whom were minors, and the others (whose rights are to be affected) were married women, were unacquainted; the ancestors of defendants, through whom they claimed, were dead; many witnesses had died, and others had removed to distant and unknown places: under these circumstances, the complainants deliberately suppress the material fact. Is there any motive for this, except the consciousness that it was incapable of honest explanation? Will the court aid a party who thus invokes its interposition? Fairness, good faith, and honesty seek no such concealment.

II. The complainants have not shown that the deed was delivered or recorded.

The answers deny positively these alleged facts.

Thomas S. Caperton swears that it was delivered, and that he left it with the proper officer for record.

On the other hand (leaving out for the present the answers in evidence), there exists the following proof against it:

1st. Neither John Caperton, who resided with the grantor, and is a brother of Mrs. Woods, nor any of the witnesses residing in the immediate neighborhood, ever heard of the deed until this suit was instituted.

2d. It was not acknowledged for two years after its date, although, by the laws of Tennessee, such instruments are required to be recorded. See Caruthers & Nicholson's Dig. Stat. Laws of Tennessee, 557, ch. 12, § 1; Ib. 587, ch. 45, §§ 1, 2; Ib. 588, §§ 1, 2. No explanation is given of this failure to prepare the deed for record, by the bill; and when T. S. Caperton is asked, on cross-examination, for one, he says he knows of none. The bill also states that the execution of the deed was notorious in the neighborhood. This is shown to be false,—*falsus in uno falsus in omnibus.*

3d. It is found, after the lapse of twenty years from its date, in possession of the grantor,—not as bailee for its safe keeping, but in

a house which he had abandoned, and among worthless papers in an old barrel, mere trash, and regarded as of no value. This circumstance too is unexplained. The bill says that the deed was lost or stolen from the register's office. This pretence is shown to be utterly false. What motive had the grantor to rob his own child, and to undo his own work? The allegations of the bill and the statements of the trustee close the avenue to an explanation, on the supposition that, after its delivery, it was deposited with him for safe keeping. The first swears that it was stolen; the second swears that if it was in the grantor's possession, after its date, he never knew it.

4. T. S. Caperton swears he delivered it for record; but it appears from Pitman's answer that it never was recorded. There is no indorsement on it that it was ever recorded, or filed for record, as required by the law; and the excuse for its non-appearance on the record, viz., that they were mutilated or destroyed by fire, is also shown to be utterly false and without foundation.

5. The prior gift to Woods, as before shown, and the subsequent conduct of all the parties, showing that the paper was regarded by them as invalid and worthless.

It is possible, though in the highest degree improbable, that the deed may have been delivered notwithstanding these opposing circumstances; but it is impossible that the deed could have been delivered and afterwards got into the possession of the grantor, upon the theory of the complainants' bill, and of their witness, T. S. Caperton. The complainants say that the deed was delivered on the day of its date, and was afterwards acknowledged and recorded; that the records were afterwards destroyed by fire or mutilated, and the deed stolen from the office, and that after the most diligent search it could not be found; that Mrs. Woods, believing herself to be remediless, and that it was impossible to be present at the sale of the slaves by the sheriff did not attempt to do so, as it seems; and that the trustee wholly failed and neglected to discharge his duty in the premises, and that her claim under the deed was notorious in the neighborhood. That is their theory and their explanation of the matter; if it be false—proven so—and inconsistent with the other facts in the case,—it not only fails to serve as an explanation of these suspicious circumstances, but adds to the force of the proof against the validity of the deed.

Their witness does not agree entirely with this explanation. He says that he did make efforts to prevent the sale, which complainants deny, and that he consulted two lawyers (both dead), who advised him that Mrs. Woods could not succeed without a production of the original, although he perfectly knew its contents.

How does this explanation stand with the facts proven? 1. The records were not destroyed or mutilated; and, 2, the non-appearance of the deed amongst the records is because it was never recorded. 3. The deed was not lost or stolen from the register's office, but remained with the grantor (Mrs. Woods's father), among his worthless papers. 4. It was never delivered for record, as pretended by T. S. Caperton, because it was the sworn duty of the officer to record it, and it was not; and it contains no memorandum that it had ever been filed; and it is in the highest degree improbable, that if it had been left for record, that it would have been taken out by the grantor before the purpose for which it was left was accomplished. 5. The claim of Mrs. Woods, under the deed, was not notorious; for all the witnesses (including her brother John) swear directly to the reverse. 6. It is in the highest degree improbable, that a lawyer should have advised that Mrs. Woods lost her title by the loss or destruction of her deed; but that two lawyers should have done so is incredible. 7. The explanation of the witness, and the complainants, is contradictory. They swear he wholly failed to do his duty; he swears he did everything, consulted two lawyers, and was advised he could not succeed. 8. And finally, the witness is inconsistent with himself. On his examination in chief, he swears that he made diligent search for the deed, and was unable to find it; and on cross-examination, when asked to explain, if he made a search, why he did not apply to Mr. Caperton, he swears that, " I did not search for said deed."

It being thus shown, that every single circumstance associated by the complainants with the alleged delivery of the deed, and its being out of their possession, is false, and manufactured for the purpose of the suit, and that their witness contradicts both them and himself, is it too much to say, that the main allegation as to the delivery avowed, which these falsehoods have been placed to brace and support, is also untrue?

But the answers are evidence; notwithstanding it appears from them that the respondents had no personal knowledge of the matter, that circumstance does not even weaken their force as evidence. See *McGehee* v. *White*, 31 Miss. R. 41. Regarding, for the present, that the bill is a sworn bill in the sense of the statute,—Rev. Code, 554, Art. 94, which abolishes the rule in chancery, requiring two witnesses to overturn the answer, whenever the complainant swears to his bill,—still I insist that it must be regarded as conclusive in the matter, and also on the point as to whether the first possession was a gift or a loan. The statute does not declare, that where the bill is sworn to by the complainant, and he produces one witness to sustain it, that the denials of the answer are to be considered by the court as disproven; but the court is directed, in such cases, to give the answer such weight and " credit as in view of the interest of the party and the other circumstances of the case, it is entitled." Rev. Code, 554, Art. 94.

The answer is positive, and the deposition of T. S. Caperton is also positive. They are in direct conflict; there is oath against oath, but both are evidence. The court must give to each such weight and credit as from the circumstances they are entitled. Upon which side of these two oaths do the circumstances of the case array themselves. If I have not been very unfortunate, I have shown that there is not a single circumstance proven in favor of the deposition of T. S. Caperton; that in many respects it is unsatisfactory, and in many others contradicted; but on the other hand they all agree and coincide with the statements of the answer.

I desire to note a few more instances of bad faith, or what is equally as fatal to complainants, the bad memory of their trustee-witness.

He says that Woods and wife were married in 1818. In this he is contradicted by all the witnesses. This mistake or misrepresentation is important and material. For if he were right, then the delivery of the slaves in the first instance, must have been nearly contemporaneous with the execution of the deed. It is shown by the other evidence that Woods and wife resided with the grantor several months after their marriage, and that the slaves were not delivered until they went to housekeeping. If this witness is to

be believed, the delivery must have been but a few days before the date of the deed; and hence, the presumption in favor of a gift would not be so strong, if indulged at all.

Again, he swears that A. Woods, at the time of the marriage, was insolvent—pressed with debt—and so regarded by the family. John Caperton proves that Woods was then only eighteen years of age. And Calloway Garner swears that Woods was then regarded as a young man of fine prospects, and was said to have a good deal of property; and the " old folks were much pleased with the marriage." H. Petty, a son-in-law of complainants', says he had property, but not at his command.

It is certainly remarkable that he should be insolvent at eighteen years of age, when he was incapable in law of making a debt.

But we are not bound to show that the proof, in the question of the gift before 1818, and the delivery of the deed, preponderates in our favor. The question is not, is the decree manifestly right, but is it clearly wrong. It is the duty of him who alleges error in the court below, to show it clearly to this court; and unless he can do so, the judgment will not be disturbed. See *Fox* v. *Matthews*, 32 Miss. R. 443, where this principle is distinctly recognized in a chancery case, and applied. The judgment is not without evidence, nor can it be said to be clearly and manifestly against it.

There is another consideration which I think might properly be urged in support of the judgment. Mrs. Woods (if not Andrew Woods) was clearly a competent witness under the Revised Code. See Art. 190, Rev. Code, 510. This article applies in expess terms to suits in equity. Nor does the provision that the deposition of such witness shall not be taken, exclude her : 1st. Because, as the law intended to secure this right to all parties in all suits, in order to apply it to chancery, it must be understood that the party could be examined *ore tenus*, or they might have applied for an issue to a jury. She did apply to swear to the bill, but she was not in favor of being subjected to a cross-examination.

I further insist that the bill was not sworn to in this case, so as to come within the provisions of the statute modifying the rule as to two witnesses in the chancery court. The language of the act is, that the rule is abolished " in all cases where the bill is sworn to by the complainant."

It establishes a rule in derogation of the .common law, and is therefore to be strictly construed. Upon the language of the statute there can be no difficulty in the construction. It was insisted in the court below, and probably will be here, that, by Art. 223, p. 516, the oath of an agent or attorney is sufficient. But this article only applies to proceedings in the Circuit Court. It is a part of the circuit court law, and does not in terms refer to chancery cases, as does the article 190 before quoted, in reference to the competency of witnesses. Moreover, if it were conceded that the provision did apply to chancery proceedings, it would not affect the question under consideration. The article in question refers only to cases, where an oath is required by law to be made, as the foundation and necessary prerequisite to some proceedings to be based on it. It can in no just sense be said that an oath is required by law, when it is perfectly optional with the party to make it or not.

Again, if the construction insisted on in the court below were adopted, it would result in this absurdity, that the oath of one man would have the effect of overturning the answer if made twice; but if made only once, it would have no such effect. For if the oath of the agent be sufficient to make the bill a sworn bill, in the sense of the rule, then he, being a competent witness, might be examined, and his testimony would alone be sufficient to overthrow the answer. A construction which gives such efficacy to the formula of making two oaths, by the same person, to the same matter, instead of one, certainly cannot be adopted.

III. There is no proof that the deed was ever accepted. It is nowhere shown, that either Mrs. Woods or Andrew Woods, ever saw the deed or knew its contents, until September, 1856. It is not shown that either were present at its execution, or ever knew of its existence. Giving to T. S. Caperton's testimony all the force that is contended for by the other side, it still falls short of proving an acceptance by Mrs. Woods or her husband, until, at least, after the slaves had been sold. If the negroes were in possession of W. Caperton, on the 6th April, 1818, it certainly could not have been longer than for a day. The witness does not state they were out of the possession, for a longer period than was necessary to execute and deliver the deed, not over an hour. As Woods and wife lived not more than one-quarter of a mile from W. Caperton, such

short possession of W. Caperton for the time specified, might have been, and probably was (if in fact it existed at all), without the knowledge or consent of Woods and wife; and hence, the continuance of their possession afterwards, furnishes no ground for the supposition that the deed was accepted.

IV. As to Pitman and Dismukes, the proof shows clearly that their title is complete by the adverse, possession in Tennessee. Rebecca Curtes says, that Britton had possession of Mary (the mother of Jack and Nancy), in 1830, in Tennessee, and Calloway Garner shows that he bought the slave Mary from Britton in Tennessee in 1836, and brought her to this State in November of that year.

The Statute of Limitations in Tennessee as to personalty is three years, and it operates not only to bar the remedy, but to vest title in the adverse possessor. See *Kegler* v. *Miles*, Mart. & Yerger, 426; *Partee* v. *Bridget*, 4 Yerg. 174; *Hardeson* v. *Hays*, Ib. 507.

And wherever the Statute of Limitations of another State, not only bars the remedy, but extinguishes the right, it may be pleaded here. See *Hamilton* v. *Cooper*, Walker R. 542; Story's Conflict Laws, §§ 582, 582 b; *Shelby* v. *Guy*, 11 Wheat. 361; *Fears' Administrator* v. *Lykes*, 35 Miss. R. 633.

In Tennessee, where the trustee is barred, the *cestui que trust*, although an infant or married woman, is also barred. *Fergusson* v. *Kennedy*, Peck's R. 321; *Williams* v. *Otey*, 8 Humph. 563.

V. All the defendants are purchasers for a valuable consideration and without notice.

Equity will never grant relief against a *bona fide* purchaser without notice, and this doctrince applies as well to purchasers of personal property, as of real estate. The reason upon which the doctrine is founded, is that equity will not disturb a possession which it is not unconscientious or inequitable for the defendant to retain; and that as he has parted with his money in good faith, under the belief that his title was good, he ought not to be disturbed. This reason applies as well to personalty as to realty. In England, where the rule first grew up, it may have been applied at first to real estate alone for the obvious reason, that there, and in that age, personal estate was but a small portion of the property of the king-

dom, and therefore did not occupy the attention of the courts and legislature to the same extent as realty ; but even there, since the progress and advance of that people in commerce and manufactures, has increased so largely the value of personal estate, the doctrine is now applied to personalty. See *Joyce* v. *De Moleyns*, 2 J. & L. 374, cited, and the opinion of Lord Chancellor Sugden, quoted at length in 2 Leading Cases in Equity, part 1, p. 41, 42.

This doctrine has been recognized in this court. See *Ewing* v. *Cargill*, 13 S. & M. 83, 84; see also *Wyse* v. *Dandridge*, 35 Miss. Rep.

And in Tennessee, where the deed under consideration was executed. See *Eaves* v. *Gillespie*, 1 Swan's R. 128–132.

To constitute a purchaser for a valuable consideration, and without notice, the following facts must exist:

1st. He must be a purchaser of the apparent legal title, but,

2d. It is not essential that he acquire the actual legal title.

3d. The purchase must be without notice, and,

4th. The weight of authority is (see 2 Leading Cases in Equity, before cited), that the purchase is good, as well against a legal as an equitable title.

But for the present, let it be conceded that it is good only against an equitable title, and,

1st. The defendants are purchasers of the apparent legal title. The vendor was in possession, claiming title, and apparently the owner. The title to slaves passes without writing. A person purchasing a chattel is not bound, therefore, as in cases of land, to inspect his vendor's title-papers, and trace it to an original fountain-head ; there is no such common source of title to personalty, as the government is in regard to land. He is, therefore, only bound to examine the record of mortgages, and deeds of trust, and the judgment roll, and see if there be any lien on the property. The possession and claim of title of personalty, is at least as good evidence of title, as a forged will or deed of realty, and in such a case the doctrine was applied. See *Bassett* v. *Nosworthy*, 2 Leading Cases in Equity, part 1, p. 33.

But we actually acquired the legal title when we purchased.

The legal title was vested in the trustee, and as to Mr. Nelms (the ancestor of Dismukes and wife and Pitman's wards), the legal

title of the trustee had vested in Britton and Garner by the adverse possession in Tennessee. The Statute of Limitations and adverse possession, not only barred the remedy but vested the title. See Tennessee authorities before cited. Nelms then was a purchaser of the legal title.

Purnell, the ancestor of Sturdevant's wife, was also a purchaser of the legal title. He bought from Ross in 1848. Wilson, Ross's vendor, bought in 1842, and the legal title of the trustee was barred in this State. We are not insisting that because he was barred, that Mrs. Woods was also barred, but only that the trustee was barred, and that the legal title was thereby vested in Ross, Purnell's vendor.

It is no answer to this to say that the trust was an executed one, and that the trustee had the dry legal title. The legal title was in him, and he alone could enforce it, and if not in him, it was executed in Andrew Woods, the husband, the wife being incapable of holding the legal title for her own use. It is perfectly clear that Mrs. Woods only had an equity, and that her estate was such as to make her bound by the rule under consideration. See *Eaves* v. *Gillespie*, 1 Swan R. 132; where the husband was held to have the legal title and the purchaser was protected. This case is important, as it was decided in Tennessee, where this deed was made, if made at all.

It makes no difference therefore, whether the trust was executed or not, for if the legal title was in the trustee, it was barred; and if in the husband, he conveyed it by his sale.

Moreover, the parties are protected by the legal title vesting in them after their purchase. Their adverse possession, under the Statute of Limitations in this State, vested in them the title after their purchase. A subsequently acquired legal title will protect a *bona fide* purchaser for value. See 2 Lead. Cas. Eq. part 1, p. 37, 38, *et seq.*

But Mrs. Woods claims only in equity. She sets up only an equitable title in her bill. She asks no relief upon the ground that she has the legal title. She expressly claims an equity, and no more. The court will not allow her to set up one title in her bill, and another in the hearing. She is bound by her title as set out in her bill.

But we insist, further, that the claim of Mrs. Woods is old and

stale, and that it will not be enforced. Every presumption that can fairly be made, shall be indulged against a stale demand. The court will reject it on considerations of public policy. *Pickering* v. *Lord Stamford,* 2 Ves. J. 582; *Tevis* v. *Eliza,* 7 Dana, 399–418; 4 Denio, 215.

If the staleness of the demand is not an absolute bar, yet the court will consider it as a very unfavorable circumstance, where the claim is not clearly made out, and where there is conflict in the testimony. This fact, then, strengthens greatly my position in reference to the prior gift,—the delivery and acceptance of the deed.

But again: Mrs. Woods says she knew her claim, but permitted the sale, without objection. She quietly permits others to invest their money on the faith that the property was her husband's; and she is now estopped to set up a claim to it. Here coverture was no excuse. See 2 Lead. Cas. Eq., and cases cited, part 1, p. 47.

There never was a stronger case for the application of the rule than the present.

Upon the whole case, it is submitted that the decree should be affirmed.

HANDY, J., delivered the opinion of the court.

This was a bill in equity, filed by the plaintiffs in error, to recover of the defendants certain slaves in their possession, alleged to be the separate property of the female complainant.

The bill states, in substance, that the complainants were husband and wife on the 6th April, 1818, residing in Franklin county, Tennessee; and on that day, that William Caperton, the father of the wife, conveyed by deed to Thomas S. Caperton, her brother, as trustee, and to her separate use, a slave named Hicksey; which deed was, at February term, 1820, of the County Court of that county, in which the property was located and the parties resided, duly acknowledged; and they believe that the deed was duly registered in that county, but that the records of the office in which it was recorded have been either destroyed by fire, or mutilated, and are unavailable to the complainants; that the deed was, at its date, delivered to the trustee, and the slave then put into the possession of Mrs. Woods, and so continued until some time between the years 1830 and 1835, during which time the slave had issue, a child

Mary, both of which were sold during that period, by the sheriff of Franklin county, under executions against the husband alone, and as his property, to James Britton, who had notice of the claim of the wife under the deed, the same being a matter of notoriety in the neighborhood. That at the time of that sale, the deed had been lost or stolen from the register's office, and could not be found after diligent search; and that, the wife being then under disability of coverture, the trustee wholly failed to perform his duty and protect her rights, the complainants believing that the sale could not be prevented, nor her rights protected, without the production of the original deed; but the slaves were sold without her consent. That the deed remained lost until recently, when it was sent to the complainants by one Martin, who had found it in Tennessee. That after said sale of the slaves, they each had issue, Mary having a child Jack, now in the possession of the defendant Pitman, as guardian for his wards, who derived title from one Nelms, and a child Nancy, now in the possession of the defendants Dismukes, who derived title also from Nelms; and that Amanda, the child of Hicksey, during the year 18——, came to the possession of Wallace Wilson, under a purchase from Andrew Woods, without the consent of the wife, Wilson being fully apprised of the conveyance to the use of the wife, and that Amanda has several children; all of which slaves are in the possession of the defendant Sturdevant and wife, as distributees of one Purnell, who acquired possession from one Ross, who claimed title from Wallace Wilson; and that the wife has not in any manner disposed of the said slaves. The prayer is for a restoration of the slaves to the wife's possession, and for hire.

The answers deny that William Caperton, the father of Mrs. Woods, was the owner of the slave Hicksey on the 6th April, 1818, and state that the complainants were married in Tennessee, in March, 1817, and resided a short time thereafter with the wife's father, and then, in the same year, left his house, and went to house-keeping, at which time William Caperton made a parol gift of the slave Hicksey to Andrew Woods or his wife, delivering possession to them, whereby the husband became the lawful owner. They deny the delivery of the deed to Mrs. Woods, or to the trustee, or to any person for either of them, and the acceptance of the deed by her, or any one for her; and deny the allegation of the bill, that

the records of the register's office of Franklin county, Tennessee, have been lost, or mutilated, or destroyed by fire, or otherwise; and one of the defendants states that he has examined said records since the institution of this suit, and that said records are in a good state of preservation, which statement is adopted by the other defendants as part of their answers. They deny that the deed was stolen from the register's office in Tennessee, or that it was ever out of the possession of William Caperton, and state that it was found by Martin, who sent it to the complainants, among some old papers left by Caperton at the place where he formerly resided in Tennessee. They admit the sale of the slaves in Tennessee, for the debts of Andrew Woods, and allege that he acquired possession of them in 1817, claimed and exercised ownership of them as his own property, and sold some of them as such.

The defendants, Sturdevant and wife, admit that they have in possession the slave Amanda, and certain of her children, and hold them as distributees of one Purnell, and admit that she was sold by Andrew Woods to his brother-in-law, Wallace Wilson, who sold her for a valuable consideration, to one Ross, in the year 1848 or 1849, who purchased without any notice of the claim of Mrs. Woods, and who sold her in 1849 to Purnell for a valuable consideration, and who purchased in good faith, and without notice of the claim of the present complainants; and they rely upon the titles of said several purchasers as having been made *bona fide* and without notice, and exhibit the bill of sale of Ross to Purnell. They state that Ross's title was acquired in consequence of a suit instituted by him against Andrew Woods, to enforce a mortgage on said slaves, executed by Andrew Woods, in the course of which suit William Caperton signed a bond for the forthcoming of the slave Amanda to answer the suit, but that neither Andrew Woods nor William Caperton, during that litigation suggested anything about the separate claim of Mrs. Woods here set up. They rely upon their adverse possession of the slaves since the year 1848, or 1849, and the Statute of Limitations. They also set up, by way of demurrer, as a defence, the Statute of Limitations, the insufficiency of the title to the slave Amanda and her increase, either legal or equitable, as stated in the bill, &c.

The defendants, Pitman and Dismukes, admit their possession of

the slaves, as stated in the bill, and that the slaves Hicksey and Mary were sold in Tennessee, as stated in the bill, but at what time they are unable to state. But they allege that the slaves continued, after that sale, in the adverse possession of the purchasers, in the State of Tennessee, for such a length of time that, by the laws of that State, title to the same was vested in the purchasers there, and they rely upon the title so acquired; that the slave Mary was owned by one or two persons in that State before she was sold to one Garner, by whom she was sold to one Wadlington, who sold her to one Thompson, by whom she was sold to Martin Nelms, under whom these defendants claim title; and that all these persons, and especially Nelms, were purchasers for value, without notice of the claim here set up; that the complainants have been for about eighteen years residing in the neighborhood where Nelms has had these slaves in possession, claiming them as his property, and have set up no claim to them until recently. These defendants set up the same matters of defence, as stated in the answer of Sturdevant and wife.

Upon the final hearing upon the pleadings and proofs, the bill was dismissed.

The merits of the case depend mainly upon two questions: 1st. Whether the right and title to the slave Hicksey, upon the evidence shown by the record, were in William Caperton at the date of the deed under which the complainants claim? And 2d. Whether that deed was executed and delivered by William Caperton, and accepted by the trustee or by Mrs. Woods, and considered and intended by the parties as a complete conveyance? These questions have an intimate connection with each other, so that the evidence applicable to one, has a direct bearing upon the other; and they will, therefore, be considered together upon the facts and circumstances shown in evidence.

It is shown by the evidence, that the slave was put into the possession of Woods and wife, shortly after their marriage, by William Caperton, her father, upon their commencing housekeeping; and it is admitted that this creates the presumption that the delivery was intended as a gift and advancement to the ·daughter, which, unless rebutted by sufficient proof, would vest the title in the husband under the law then existing in Tennessee, where the transac-

tion took place. But it is insisted that this presumption is destroyed, and that the evidence establishes that it was intended as a mere loan, which was terminated by the father in a short time resuming possession of the slave, and executing the deed of gift set up in the bill. On the contrary, the defendants in their answers deny the execution and delivery of this deed, and insist that it never had legal validity, and that the slave was never restored to the possession of William Caperton, but continued in the possession of Woods and wife under the original delivery, which was a gift, until sold as his property.

The claim of the complainants rests almost entirely upon the testimony of Thomas S. Caperton, the trustee named in the deed of gift of 6th April, 1818, the brother of Mrs. Woods. He testifies that he saw the deed executed at the time it bears date, and was then living in Winchester, Tennessee, and that it was delivered to, and accepted by, him as trustee, and was afterwards, in the year 1820, acknowledged by his father in his presence in the County Court, at the date stated in the acknowledgment indorsed upon it, and was then delivered by witness to the deputy clerk for registration, and that was the last time that witness saw it; that at the time of the execution of the deed, the slaves mentioned in it were in his father's possession, but had been in the possession of Woods and wife prior to that time, his father having loaned them, but he made no gift of them until he made the deed; that the slave Hicksey was in his father's possession, and present when the deed was made, and called up by him, and delivered over as the property of Mrs. Woods, under the deed. He states that he did not make any effort to prevent the sale of the slaves by the sheriff, because he was unable to find the deed after diligent search for it; that his impression is that the complainants were married in the early part of the year 1818, and that Woods was then embarrassed in his pecuniary condition, and was regarded by the family as insolvent.

On cross-examination he states, that he made an effort to prevent the sale of the slaves, when about to be made by the sheriff, in Tennessee, but failed, because the deed of gift could not be found; that he consulted two lawyers on the subject, who told him he could recover the slaves provided the deed could be found; that he did not search for the deed, and never applied to William Caperton for

it, as he did not suppose he had it, but he frequently asked witness whether he had found it; that he knew at the time the substance of the deed, but does not know why this was not regarded as sufficient to protect Mrs. Wood's title; those whom he consulted insisted that the deed must be produced; that he does not know why it was not acknowledged until 1820.

Campbell Martin testifies, that he found the deed, about twenty years ago, in a house formerly occupied by William Caperton, in Tennessee, in an old barrel, among a mass of other old papers owned by Caperton, and it remained in his possession until he sent it to complainants, about twelve months before the date of his deposition.

The deed has upon it no mark or entry showing that it had been recorded in Tennessee, or had been filed in any office for that purpose.

John Caperton testifies that, according to his best recollection, the complainants were married in the year 1817, and that Woods was then about eighteen years of age; that they were married in the spring, and lived with William Caperton's family until the fall of that year, when they went to housekeeping, and the slaves were put in their possession, and went home with them; that witness resided with his father, William Caperton, in 1817, and continued so until 1821, but knows nothing of the execution of the deed; that the slaves remained in the possession of Woods as long as witness lived in Tennessee; that he never saw the deed until it was shown to him upon his examination as a witness, to the best of his recollection; does not know, and never heard his father say, whether, when the slaves were first delivered to Woods, it was a loan or a gift, and does not know that they were redelivered to his father before 6th April, 1818; that he is of the opinion that his father gave the slaves to Woods's wife when they went to housekeeping in the fall of 1817, because she claimed them, and he never heard his father, with whom he was then living, set up any claim to them afterwards that he recollects.

Elizabeth Woods testifies, that she lived within half a mile of complainants when they were married, and always understood that William Caperton gave the slaves to Woods and wife soon after their marriage, and such was the understanding in the neighborhood;

that the slaves went into their possession then, and so continued until they were sold, and it was not known in the neighborhood that they were the separate property of Mrs. Woods, and she never heard that William Caperton had loaned the slaves to complainants when first put in their possession, but believes that it was notorious in the neighborhood, that complainants exercised control over them from that time, until they were sold at sheriff's sale.

Matilda Patrick testifies, that she resided in the neighborhood of complainants and William Caperton, and believes that complainants were married in the early part of the year 1817, and very soon after the marriage, Woods had the slaves in possession and claimed them as his property, and continued in possession of them from that time until they were sold by the sheriff; that it was notorious in the neighborhood that he claimed and exercised ownership of them; that witness's husband purchased one of them from Woods, which he would not have done, if the claim of separate property in Mrs. Woods had been known in the neighborhood; and this sale was before that by the sheriff; that she never heard of the deed of gift to Mrs. Woods.

Charles G. Garner testifies, that he was intimately acquainted with the complainants from the year 1812 or 1813, and believes they were married in the early part of 1817; that the slaves were in their possession from a period soon after their marriage until 6th April, 1818, and until afterwards sold, and the claim and ownership of Woods were notorious in the neighborhood, and it was also notorious that the slaves were given by Caperton to Woods and wife, after they were married and when they removed home to live; he never heard that it was a loan, but always understood that it was a gift, from the time they were married or soon after, when they removed home, and he never heard of it as a gift by deed before the claim here set up. The slaves were sold at sheriff's sale as the property of Woods, in Tennessee, some time between the years 1827 and 1830, and purchased by James Britton, who sold the girl Mary, in July, 1836, to witness, who sold her to Wadlington, in November or December, 1836, when she was taken to this State; witness bought Mary near where Woods and wife lived in Tennessee. He further states, that he believes the pecuniary condition of Woods when he was married was good, and he was said to have a plenty

of property, and to be a young man of fine prospects, and Mrs. Woods's parents were well pleased with the marriage.

Rebecca Custer testifies, that James Britton had Hicksey and Mary in his possession, in Tennessee, in the year 1830, and during that year, and for more than a year.

From this review of the evidence, it is clear that the slave Hicksey was delivered by William Caperton to the complainants, shortly after their marriage; and this, in presumption of law, made it a parol gift, and vested the title in the husband. The question, then, is whether the proof is sufficient to establish that it was a loan and not a gift. The affirmative of this proposition, it is insisted, is shown by the execution and delivery of the deed of gift by William Caperton, and the circumstances attending the execution of that instrument. The delivery of the deed being denied by the answers of the defendants, it is incumbent on the complainants to establish it by the evidence; and the first question which we will consider, is whether the evidence sufficiently proves it.

The testimony of Thomas S. Caperton, the trustee in the deed, is clear and direct, that the deed was signed and delivered to him by his father on the day of its date, and accepted by him, and that the slave was then delivered over to Mrs. Woods; and afterwards, in February, 1820, it was acknowledged by his father, and handed by the witness to the clerk of the proper court for record, since which time he has not seen it, until shown to him on his examination as a witness. He further states that the slaves, which had previously been in the possession of Woods and wife, were in the possession of his father at the date of the deed, and that the previous possession of Woods and wife was as a loan.

If this testimony be entitled to full weight, it would leave no doubt upon the mind, of the facts so positively stated, that the original possession of the complainants was as a loan, and that that was determined by the father taking possession of the slaves, and executing and delivering in due form the deed of gift. But we are of opinion that the facts and circumstances shown in evidence, greatly impair the force of this testimony, and render it unreliable.

The first suspicious circumstance against the statements of this witness, is that the deed was not found where he states he deposited

it for record, and where either the original or the record of it should have been found.

It bears upon it no mark that it was ever deposited in the register's office for record, and it contains no certificate or memorandum showing that it had been recorded. These things it was the duty of the register to do ; and the absence of any entry on the deed showing that they were done, is a very strong circumstance to show that the deed was never filed for record. In addition to this, there is no record of the deed in the office. The effort in the bill to account for this, by stating that the records of the office have been destroyed by fire or mutilated, is positively denied in the answers made, upon the personal examination and inquiry of one of the defendants ; and there is no proof whatever of that important fact. So that both the absence of any entry of filing, or certificate of registration, on the face of the deed, and of any registration of the deed upon the record, tends very strongly to disprove the fact so positively stated by the witness, that he left the deed with the clerk for record.

But the deed is found some twenty years after its date, among the waste and useless papers of the donor. If it was delivered by him, and especially if it was filed for registration, how did it get back into his possession ? There is no effort to account for this, and no reasonable way to account for it, for aught that appears. Nothing is shown which could explain his possession of it. His possession of it, coupled with the facts of its having upon it no marks of having been filed for registry, and no certificate of registration, and that there was no actual registration of it, are of almost irresistible force to show that it was never delivered for record, and never delivered as an operative deed. But the additional fact that it was found among his waste papers after many years, must remove almost every doubt from the mind, that it was never delivered by him, and was considered by him useless, and never consummated.

Much strength is given to this conclusion, when we take into view the facts which are proved by numerous witnesses, neighbors, members of the family, and intimate friends, that the existence of the deed was unknown in the neighborhood; that Woods always treated the slaves as his property, and made sales of them, both in Tennes-

see, to his neighbors, and in this State, to his family connections, and that all parties, Woods, the trustee, and his father, all submitted to a sale of them by the sheriff in Tennessee, as the property of Woods, without any notice whatever to the community, or to the purchaser at the sale, that Mrs. Woods had any claim upon them under the deed.

Again, the conduct of this witness in relation to the property, is wholly irreconcilable with the due execution and validity of the deed.

He attempts to account for his failure to assert the rights of Mrs. Woods, by the fact that the original deed was lost. He does not pretend that he could not have obtained a copy of it at that time, or that it had not been recorded, or that the record was destroyed, but that it was necessary to have the original. Suppose that this statement is true: it might serve to account for his failure to institute legal proceedings to protect the rights of the *cestui que trust ;* but it would not account for his entire failure to give any notice whatever of the rights in his hands, to the purchaser at sheriff's sale, or to the community who were dealing with Woods, and treating the property as his. Such would have been the course of any prudent man, having in charge the rights of his sister, though at that time he might not have been prepared to assert the right in a legal form. Common honesty, and ordinary care for the rights intrusted to him, would have led him to make known the claim. But, from his account, he permitted the rights of his sister to suffer the great prejudice of having the property sold as belonging to Woods, without the least notice of her claim: a course alike strange and unaccountable, either upon rules of common prudence or of his legal duty.

But it is altogether incredible that two lawyers, who were worthy to be consulted, should have advised that he could not set apart the rights under the deed, without the production of the original, when, for aught that appears in his testimony, it was recorded in the proper office where the law authorized such deeds to be recorded, or if not, when he states that he knew its contents, and could have proved them either by his own or his father's testimony.

Again : there are other circumstances tending strongly to show, that the deed was never a complete and valid conveyance.

John Caperton, the brother of this witness, and who lived with his father, never heard of the deed, and considered the slaves the property of Woods and wife, from the time they first were placed in their possession after their marriage, and he never heard his father claim them afterwards. Several other witnesses, intimate friends and near neighbors, state that they never heard of the deed, and that the slaves were considered by the community as the property of Woods and wife, from the time of the original delivery of possession to them. During the litigation in this State, upon a mortgage of some of the slaves, executed by Woods, and to which William Caperton was privy, although an effort was made to avoid the force of the mortgage upon them, yet no effort was made to set up the rights of Mrs. Woods to them, which might have been effectual to accomplish the object of the parties to defeat the mortgage; and the slaves were actually sold shortly afterwards to a family connection, Wallace Wilson, who had married the sister of Mrs. Woods. During these transactions, no notice of the complainants' claim under the deed was given, either by them, or their trustee, or by William Caperton.

There are also other suspicious circumstances attending the testimony of Thomas S. Caperton.

He acknowledges his inability to account for how the deed was not acknowledged until nearly two years after its date, although he professes to have a distinct recollection of the circumstances attending its acknowledgment and execution; and this, too, when the alleged purpose of its execution would demand that it should have been completed without this delay. He states that the original possession of the slaves by the complainants was a loan, and that his father resumed possession before the deed was executed. John Caperton, who lived with his father, states that the slaves did not come back to his possession after the first delivery, and this is corroborated by other witnesses, who state that Woods retained possession until the slaves were sold. He states at one place that he made diligent search for the deed; at another, that he did not search for it. He states that Andrew Woods was insolvent from trading, when he was married, and holds this up as a reason against his father's making a gift of the slaves when they were first delivered to him. On the contrary, John Caperton states that Woods

was only about eighteen years of age when he was married, and could not have been insolvent from his contracts. Garner states that he had a plenty of property, was a young man of fine prospects, and that the family of Caperton were well pleased with the marriage. Finally, his statements in relation to the original possession of the slaves by complainants being a loan, and William Caperton's resuming possession of them, are naked, general statements of these things as conclusions, without any of the particulars or reasons which a witness would naturally give in testifying upon such points, and which he gives in relation to other matters in his deposition.

Upon consideration of all the testimony, we are satisfied that the weight of evidence is against the delivery and validity of the deed, and that the presumption of a gift by the original delivery to the complainants, is not destroyed. But whether the original possession of the slaves by the complainants was a loan or a gift, it is not necessary to determine in deciding this case. For the complainants' claim rests upon the deed; and if that be invalid, the decree dismissing the bill should be affirmed, though the original delivery to the complainants was not a gift.

Many other incidental questions have been raised and discussed by counsel; and other views taken in support of the decree might be stated as sufficient to sustain it; but as the above view disposes of the case upon the main ground on which it is founded, it is unnecessary to consider other questions.

Let the decree be affirmed.